UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Edwin Moreno,<br>　　　*Plaintiff*,<br><br>　　　　　*v.*<br><br>City of New Haven Department of Police Service,<br>Francisco Ortiz, Racheal Inconiglios, and Alfonso<br>Vasquez,<br>　　　*Defendants*. | Civil No. 3:07cv851 (JBA)<br><br><br><br><br>March 9, 2009 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. # 26]**

Plaintiff Edwin Moreno brought suit against Defendants City of New Haven Department of Police Service (the "City"), Chief of Police Francisco Ortiz,[1] Detective Racheal Inconiglios,[2] and Detective Alfonso Vazquez[3] following his arrest, trial and acquittal on charges related to the murder of Arthur Conley on May 10, 2004. He brings claims of false arrest and malicious prosecution under 42 U.S.C. § 1983, and intentional infliction of emotional distress under Connecticut state law, against Detectives Inconiglios and Vazquez.

---

[1] Plaintiff's briefing clarifies that he is no longer asserting claims against the City or Ortiz and agrees that summary judgment may be entered in favor of these two defendants. (Pl.'s Am. Obj. Defs.' Mot. Summ. J. [Doc. # 35] at 1.) Summary judgment is therefore granted as to all claims against Defendants Francisco Ortiz and the City.

[2] Since the filing of this lawsuit Defendant Inconiglios has changed her name to Rachael Ross. (*See* Affidavit of Racheal Ross, Formerly Known as Racheal Inconiglios, Ex. 1 to Defs.' Rule 56(a)1 Statement [Doc. # 27] ("Inconiglios Aff.").) The official case caption has not been changed to reflect this name change, and all parties' pleadings refer to her as Ms. Inconiglios. The Court will do the same.

[3] In the caption Defendant Vazquez's last name is spelled as "Vasquez," but in his affidavit he spells and signs his name as "Vazquez." (*See* Affidavit of Alfonso Vazquez, Ex. 2 to Defs.' Rule 56(a)1 Statement [Doc. # 27] ("Vazquez Aff.").) Therefore, the Court refers to him as "Vazquez."

Following completion of discovery, Defendants moved for summary judgment on all claims. For the reasons that follow, Defendants' motion is granted.

I.      **Factual Background**[4]

On the evening of May 10, 2004, officers of the New Haven Department of Police Service responded to a call that a man had been shot at 201 Franklin Street, Apartment 1316, in New Haven, which they determined was leased by one Diane Mallory.  Between May 10th and May 12th, New Haven police interviewed 16 witnesses, including two interviews with two of the witnesses.

When Defendants Inconiglios and Vazquez arrived at the scene, Detective Martin Dadio informed them that a witness named Ramona Holloway had told him that on May 9th she had been approached by "a Hispanic male" with whom she had gone to high school and whose first name she remembered was "Edwin."  "Edwin" asked Holloway where he could find an individual who Holloway recognized from Edwin's description to be Conley, although "Edwin" did not know Conley's name at the time.  According to Detective Dadio, Holloway said that "Edwin" told her "that he (the Hispanic male) was going to kill the individual" (Conley).  Holloway also told Detective Dadio that "Edwin" told her that he had

---

[4] The Court derives the facts discussed from seven documents whose factual contents are not disputed: the Case Incident Report Signed by Racheal Inconiglios, Dated May 22, 2004 (Ex. D to Pl.'s Am. Mem. Opp'n Summ. J. ("Inconiglios 5/22/04 Report")); the Case Incident Report Signed by Rachael Inconiglios, Dated September 22, 2005 (Ex. E to Pl.'s Am. Opp'n Summ. J. ("Poindexter Report")); the Case Incident Report Signed by Martin Dadio, Dated May 20, 2004 (Ex. 5 to Defs.' Local R. 56(a)1 Statement [Doc. # 27] ("Dadio 5/20/04 Report")); the affidavits of Plaintiff (Ex. A to Pl.'s Am. Mem. Opp'n Summ. J. ("Moreno Aff.")) and Defendants Inconiglios and Vazquez (Inconiglios Aff. & Vazquez Aff.); and Defendant Inconiglios's May 25th application for the warrant for the arrest of Mr. Moreno (Ex. 10 to Defs.' Local R. 56(a)1 Statement ("Warrant Application")).  The summary of this record does not constitute factual findings by the Court.

been shot the week before, which was why he wanted to find Conley. (*See* Inconiglios 5/22/04 Report at 1.) On May 11th Detectives Dadio and Vazquez showed Holloway a photo board containing eight pictures, and Holloway "did positively identify" Mr. Moreno as the "Edwin" with whom she had spoken on May 9th. (Dadio 5/20/04 Report at 1.)

On the night of the shooting Defendants interviewed Olivia Kelley, who stated that she and Diane Mallory were in the kitchen of Mallory's apartment when Conley (whose voice Olivia Kelley recognized) and a man she did not see knocked on the door. Conley identified himself as "AJ," as he was commonly known, and in response to Mallory's questioning about the man accompanying him Conley stated: "He's cool, I was locked down with him, he needs to use the bathroom," after which Mallory let them both in. Olivia Kelley stated that she went to the upstairs bedroom to fetch cigarettes and when she returned downstairs, the men had apparently gone upstairs. When she heard "a 'tussle' coming from the bathroom," she hid in the kitchen. After hearing the front door close, she left the kitchen and saw Conley lying on Mallory's interior staircase exclaiming "I'm shot!" (Inconiglios 5/22/04 Report at 2.)

Defendants then interviewed Mallory, who first told them that as she and her friend Angel Ogman were returning to Mallory's apartment after doing laundry, "she saw a Hispanic male exit her apartment door and run past her." When she entered her apartment she saw Conley "walk[] down the interior staircase from the second floor" and exclaim "'Rico shot me!'" When Defendants told Mallory that Olivia Kelley had told them a different story, Mallory recanted, explaining that because she and Olivia Kelley were in the apartment preparing to smoke crack cocaine, she was afraid that if she told the police that, she would

be unable to regain custody of her child.[5]  Mallory then explained that Conley and his girlfriend had come to her apartment for a short visit, and Conley later returned "with a Hispanic male" who Conley identified as a friend who needed to use the bathroom.  After she let them in, the two men went upstairs.  According to Defendant Inconiglios's report, "[w]ithin several minutes, [Mallory] heard a 'scuffle,' then a 'pop,' coming from the upstairs bathroom," after which "the Hispanic male [came] down the stairs, carrying a black handgun.  When she went upstairs, she found Conley in the bathroom, saying, 'Rico shot me!'"  Mallory described the man with Conley as a "Hispanic male, approximately 6'0" tall, in his early 40's, with a 'light' mustache, last seen wearing a white and black baseball cap, dark colored baseball jacket and dark colored jeans." (*Id.* at 2–3.)

On May 10th Defendants, as well as Officers D. Sacco and Bertram Etienne, interviewed Earl Torrence, who told them that he received a phone call from Conley on May 10th, after which they met at the Franklin Street apartment complex where they smoked "dust."  Torrence stated that Conley then left the apartment complex in a "white vehicle, which was operated by a black male."  When the vehicle later returned, Conley got out and the vehicle departed.  Later, Torrence said he saw "[a] white or Hispanic male exit[ an] SUV and walk[] toward Mallory's apartment.  Several minutes later, he saw the same white or Hispanic male run from the area of Mallory's apartment, enter the SUV, and speed away."  Torrence described the person as "approximately 5'10" tall, medium build with a thin

---

[5] Ms. Ogman originally gave Defendants a statement corroborating Mallory's laundry story, but when they told her that Mallory had recanted her laundry story, Ms. Ogman acknowledged that she was not with Mallory, but had corroborated Mallory's laundry story "because she knew Mallory has a pending [Connecticut Department of Children and Families] case" and that information about Mallory's drug use could result in Mallory being unable to "regain custody of her child."  (Inconiglios 5/22/04 Report at 3.)

mustache and wearing a baseball cap." Torrence stated that because he had smoked "dust" he would not be able to identify a photograph of that person, and when presented with a photo board Torrence did not identify anyone. (*Id.* at 6.)

Defendants Inconiglios and Vazquez also interviewed Kesha Cooper at the police station on the night of the shooting. Cooper stated that while sitting in her car around the time of Conley's murder, "[s]he saw a white or Hispanic male running from the area of 201 Franklin Street," enter a white four-door SUV, and speed away. She could not provide any additional description of the person she saw running. (Inconiglios 5/22/04 Report at 3.) Another officer, who was assigned to patrol Franklin Street on the night of May 10th, told Defendants that he and his patrol partner "observed a white Jeep Cherokee occupied by one black male and one Hispanic male wearing a baseball cap, parked at the dead end of Franklin Street," but could not provide any additional details. (*Id.* at 6.) Another witness, Verta Stevenson, first stated that she saw Conley "running behind 173 Franklin Street and that a white or Hispanic male was following him," but later conceded that she "saw a New Haven Police Officer," and not Conley or a Hispanic male. (*Id.*)

Defendants Inconiglios and Vazquez also interviewed Everest Saunders, Conley's girlfriend, who confirmed Mallory's statement that, prior to the shooting, she and Conley were briefly in Mallory's apartment, and then left together. Saunders also said that Holloway told her that the shooter was a Hispanic man whose name began with the letter "E" who had dated Saunders's downstairs neighbor, Alexis Santiago. Santiago stated that she and Mr. Moreno dated for eight years, that they had recently broken up, and that she had not spoken to him since May 5th. She stated "that she ha[d] seen him in a white SUV on several occasions," but that Mr. Moreno "does not drive." Monica Kelley, Olivia Kelley's sister,

stated that she was standing in the Franklin Street apartment complex courtyard and "had not seen anyone enter or exit the apartment on the night of May 10, 2004." (*Id.* at 4–6.)

Defendants Inconiglios and Vazquez interviewed Mr. Moreno, at his mother's home and at the police station. Mr. Moreno initially would not speak to the police without his lawyer present, but when told that the questions would pertain to the May 5th shooting where he was the victim, he agreed to be interviewed without his lawyer. Mr. Moreno said that his friend Kiveon Hyman knew who had shot him on May 5th, but refused to tell because "'He (Hyman) knows if he told me, I'd do something about it,'" and that he knew nothing about the May 10th shooting. When presented with a photo board containing a photograph of Conley, he "stated he did not recognize any of the subjects." (Inconiglios 5/22/04 Report at 5.)

Defendants Inconiglios and Vazquez spoke with two eyewitnesses who identified Mr. Moreno from a photo board as the person who ran across the Franklin Street apartment complex courtyard immediately after the shooting on May 10th. These witnesses, Angelo Rogers and Cornelius Goodwin, each independently stated that they were sitting together in the courtyard when they saw a Hispanic male run out of the Mallory apartment. Rogers said that "[t]he Hispanic male kept yelling, 'He tried to rob me!'" and as the man ran "he was trying to put something in the back of his pants." Rogers said that he recognized the man as "Skills," whom he had seen on two occasions, once a few months prior to the shooting and once a few weeks before the shooting. On the more recent occasion, he said that Skills and Conley had argued after Conley objected to Skills's driving an ATV through the Franklin Street apartment complex courtyard because Skills might hit a child. From a photo board, Rogers "immediately identified Moreno as the person he saw running from [Mallory's

apartment] on May 10, 2004, the same subject he saw several weeks prior operating an ATV in the Franklin Street housing complex, and the person he knows as 'Skills.'" (*Id.* at 7.)  The "Hispanic male" Goodwin also saw run through the courtyard on the evening of May 10th was the same man he had seen a few months earlier, when "the Hispanic male drove into the Franklin Street housing complex in a 'nice truck'" and introduced himself to Goodwin as "Skills." Goodwin described the same ATV-driving confrontation between Conley and Skills as Rogers had.  From a photo board Goodwin "immediately identified Moreno as the subject he saw running out of [Mallory's apartment] on the night of May 10, 2004," and who had "introduced himself as 'Skills.'" (*Id.* at 8.)

On May 13th Defendants interviewed Mallory again, this time at the police station and with a tape recorder.  Mallory repeated her post-recantation statement, adding that Conley told her that the man accompanying him was "'cool'" because "'I was locked down with him.'"  She also added "that the Hispanic male appeared to be using the handrail on the stairs to assist his walking," which led her to think that "the Hispanic male had something wrong with either his knee or ankle."  After Mallory heard the "pop," the Hispanic male came downstairs, demanded that she open the door, and left.  Mallory then instructed Olivia Kelley to call the police.  Mallory immediately identified the photo of Edwin Moreno from among eight as the person she saw enter her apartment.  (*Id.* at 8–9.)

Also on May 13th Defendants conducted a second interview of Olivia Kelley, which was recorded.  Olivia Kelley repeated her first statement, and after being shown "a photo board containing a photo of Edwin Moreno and seven other similar looking subjects," Olivia Kelley "immediately pointed to Moreno's photo and told us that he (Moreno) often came into the Franklin Street housing complex to deliver illegal drugs," that she had seen him in

a white Jeep Cherokee, but that she did not see who was accompanying Conley on May 10th, and did not recognize his voice.  (*Id.* at 9.)

Another witness, Robin Angela Douglas, told Defendants that there were rumors that Ms. Ogman's brother, Marvin Ogman, was in Mallory's apartment the night of the shooting. She also repeated a rumor that the murder weapon had been discarded in a storm drain on Franklin Street.  An area search revealed no weapons.  (*Id.* at 10.)  They interviewed Marvin Ogman, who claimed to have been home with his mother when he heard about the shooting, at which point his mother called the police and he went to the Mallory apartment.  When he arrived Cooper took Marvin Ogman's phone and called the police.  (*Id.* at 10–11.)  Phone records corroborated Marvin Ogman's story.  (*Id.* at 11.)

Defendant Inconiglios also ran computer checks that showed both Mr. Moreno and Conley had been incarcerated, but never together, that Mr. Moreno "[wa]s a convicted felon," and that Mr. Moreno did not have a New Haven or Connecticut permit to carry a pistol.  (*Id.* at 11.)

On May 25th Defendant Inconiglios applied for an arrest warrant for Mr. Moreno. In her 34-paragraph affidavit in support of that application, Defendant Inconiglios repeated many of the witness statements described above, including Mallory's laundry story, her second, taped statement, and the fact that "she had lied initially."   The affidavit also referenced both Mallory's statement that Conley had said he had been "locked down with" the man accompanying him and her finding that Mr. Moreno and Conley had never been incarcerated together.  The warrant application only describes the assailant as "Hispanic," and omits the fact that some witnesses described the person running from Mallory's apartment as "white."  (*See generally* Warrant Application.)  After a judge of the Connecticut

8

superior court issued an arrest warrant (*id.*), Mr. Moreno was arrested on or about June 16, 2004. (Warrant Application at ¶¶ 4, 20 & 30; Inconiglios Aff. at ¶ 39; Vazquez Aff. at ¶ 39; Moreno Aff. at ¶ 2.)

Three months later, Defendants Inconiglios and Vazquez interviewed Xavier Poindexter after learning that Poindexter "was associated with Arthur Conley and may have been with him the night he was murdered." According to Defendant Inconiglios, Poindexter's account was "inconsistent with the details regarding the evening Conley was murdered," and he acted "extremely hyper and uncooperative." Poindexter first said that he drove Conley to the Franklin Street apartment complex and dropped him off and left, denying any knowledge about the shooting. Then he said he left the apartment complex only after Torrence approached his vehicle and asked where Conley was. Finally, Poindexter told Inconiglios and Vazquez that on the evening of May 10th, he dropped off Conley, left his vehicle, walked into the courtyard to another apartment at 201 Franklin Street, and "saw a Hispanic male, wearing a baseball cap and a blue fleece, who he knows as 'Bone' (identity unknown) follow Conley around the building," after which he "saw people running," and "heard Conley had been shot," so he left. He said that he did not see Mr. Moreno that night. Defendant Inconiglios made no report of this interview in September 2004, and only produced one when Mr. Moreno's criminal defense counsel demanded information regarding the interview, which he had learned about because when Mr. Moreno and Poindexter were coincidentally together in the same holding pen awaiting unrelated judicial proceedings in New Haven, Poindexter told Mr. Moreno that he had been interviewed by Defendants. (Poindexter Report; Moreno Aff. at ¶¶ 16–19; Inconiglios Aff. at ¶ 43.)

II.     **Summary Judgment**

Summary judgment is appropriate where the record after discovery "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if it could lead "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant "need not prove a negative," but "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  If the record as a whole, viewed in the light most favorable to the non-moving party, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment should follow. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quotation marks omitted).

III.    **Discussion**

A.     *False Arrest under § 1983*

Under § 1983 a plaintiff must demonstrate that he was subjected to the "deprivation of a[] right[], privilege[], or immunit[y] secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  "The common law tort of false arrest is cognizable under § 1983 only if it also encompasses a violation of federal statutory or constitutional law." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995).  Here, Plaintiff premises his false arrest claim on the claim that the warrant on which he was arrested did not show probable cause.  If his arrest

10

was supported by probable cause, his § 1983 false arrest claim fails. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest [may rest] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause[.] . . . The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983.") (citations omitted).

Where parties dispute *what facts were known* to police officers at the time an individual was arrested, resolution is for the jury; where, as here, the parties do not dispute what facts were known to Defendants but dispute whether those facts support probable cause, the disposition is a matter of law. *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court.").

"In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. By its nature an inquiry into the existence of probable cause is fact-specific. Nonetheless, there exist refinements of the probable cause inquiry that guide the court. As the Second Circuit has explained, "[l]awful arrest, i.e., arrest pursuant to probable cause, requires the arresting officer to have 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation omitted).

Thus, Defendants had probable cause to arrest Plaintiff if they had "knowledge or reasonably trustworthy information of facts and circumstances that [we]re sufficient to warrant a person of reasonable caution in the belief that [Mr. Moreno] ha[d] committed . . . a crime." *Weyant*, 101 F.3d at 852.  Plaintiff argues that he was too dark, too short, too young, and too wounded to be the suspect described by the witnesses Defendants interviewed.  (Pl.'s Am. Mem. Opp'n Summ. J. at 6–7.)

There were three eyewitnesses who identified Mr. Moreno from photographs as Conley's assailant (Mallory, Rogers and Goodwin), and a fourth witness who identified Mr. Moreno in a photograph as the man who, the day before the murder, had stated his intent to kill Conley (Holloway).  These witness statements alone provided probable cause to arrest Mr. Moreno.  *See Martinez*, 202 F.3d at 634 ("'it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness'") (citation omitted); *Carlson v. Lewis*, 35 F. Supp. 2d 250, 259–60 (E.D.N.Y. 1999) (eyewitness identifications generally give rise to probable cause); *Green v. City of New York*, No. 06-CV-3942 (ERK), 2008 WL 4394679, *2 (E.D.N.Y. Sept. 23, 2008) ("The eyewitness identifications, combined with evidence of motive, provided probable cause for the arrest of plaintiff, notwithstanding the fact that one of the witnesses who also identified him, had previously identified someone else from a single photograph which she was shown").

Plaintiff, who is dark-skinned, points to the statements by witnesses who described the suspect as "white" and/or "Hispanic" and argues that his dark skin color means he "can not be mistaken for a white man."  (Pl.'s Am. Mem. Opp'n Summ. J. at 6–7.)  However, no witness described the assailant only as "white."  The four witnesses who used the racial

descriptor "white" (Mallory, Cooper, Torrence, and Stevenson) each also used the term "Hispanic." Moreover, these statements were either recanted (by Stevenson), supplemented by a photo identification of Mr. Moreno (by Mallory), or have diminished reliability because the witness was not sober and could identify no one (Torrence). In addition to the three eyewitnesses who made positive photo identifications of Mr. Moreno as the suspect to Defendants, two additional witnesses identified Mr. Moreno in photographs—as the man named "Edwin" who was looking for and stated his intent to "kill" Conley (Holloway), and as a man who had previously come to the apartment complex to "hustle" (Olivia Kelley).

Mr. Moreno argues that because he had been shot in the leg five days earlier, and as a result was on crutches at the time of Conley's murder, he could not have been the person described by witnesses as having "run" from Mallory's apartment after the shooting. Although the record read in the light most favorable to Plaintiff suggests that Defendants knew when they applied for the arrest warrant that Mr. Moreno was on crutches (*see* Moreno Aff. at ¶ 4), this information does not negate the probable cause supplied by the eyewitness identifications of Plaintiff. Goodwin and Rogers each identified Mr. Moreno in photographs as the person they saw "running out of" the Mallory apartment. And Mallory identified Mr. Moreno in a photograph as both the shooter and as someone who had trouble walking and going up her stairs.

Plaintiff also argues that two witnesses' descriptions of the suspect as being 6'0" or 5'10" (Mallory and Torrence, respectively) and one witness's description of a suspect in his early 40s (Mallory) is so inaccurate as to negate probable cause because Mr. Moreno is only 5'8" and was only 21 years old in May 2004. (Pl.'s Am. Mem. Opp'n at 7.) Mallory, however, identified Mr. Moreno's photograph *after* estimating him to be 6'0" and in his early 40s, and

13

Torrence's estimate of 5'10" is not far off, despite his acknowledged intoxication.

Finally, Plaintiff argues that the statements of Mallory and Olivia Kelley that Conley told them that the man accompanying him into Mallory's apartment had been "locked down" or "locked up" together, precludes any finding of probable cause because Defendants knew that Mr. Moreno was never incarcerated with Conley.  Assuming that Conley's statement meant that he and the assailant once had been incarcerated together, it is not so disproportionately exculpatory of Mr. Moreno as to eliminate the probable cause that Defendants had from the multiple eyewitness identifications of him.

Even taking into account the evidence pointing away from Mr. Moreno as the shooter, the remainder, including three eyewitness identifications, was sufficient to "warrant a person of reasonable caution in the belief that" Mr. Moreno had killed Conley.  Because Defendants had probable cause to arrest Plaintiff, summary judgment must be granted in their favor.  In light of the Court's conclusion that probable cause existed to arrest Mr. Moreno, it is unnecessary to address Defendants' argument that they are entitled to qualified immunity.  *Walczyk*, 496 F.3d at 152 n.14 (2d Cir. 2007) (a "holding that probable cause supports the arrest of" a plaintiff claiming false arrest "obviates the need for an immunity shield—state or federal—on those claims") (citing *Weyant*, 101 F.3d at 852).

B.      *Malicious Prosecution under § 1983*

To prove a claim of malicious prosecution by Connecticut state officials under § 1983 a plaintiff must establish both the elements of malicious prosecution under Connecticut law, and his deprivation of a Fourth Amendment right.  *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002).  In Connecticut,

14

> [a]n action for malicious prosecution against a private person requires a plaintiff to prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.

*Bhatia v. Debek*, 948 A.2d 1009, 1017, 287 Conn. 397, 404 (2008) (quoting *McHale v. W.B.S. Corp.*, 446 A.2d 815, 817, 187 Conn. 444, 447 (1982)).

The first two elements—that Defendants initiated or procured the criminal charges brought against Plaintiff and that Plaintiff's acquittal on all charges is a termination in his favor—are undisputed.  Furthermore, there is no dispute that Plaintiff's pretrial detention of 17 months (*see* Moreno Aff. at ¶ 26) was a deprivation of liberty sufficient to satisfy the Fourth Amendment element of his § 1983 malicious prosecution claim.

The parties thus dispute only the existence of probable cause to prosecute Mr. Moreno, and whether Defendants acted with malice, which "may be inferred from lack of probable cause."  *Falls Church Group, Ltd. v. Tyler, Cooper and Alcorn, LLP*, 912 A.2d 1019, 1027, 281 Conn. 84, 94 (2007); *see Mulligan v. Rioux*, 643 A.2d 1226, 1241–42, 229 Conn. 716, 745–46 (1994) ("'Want of probable cause and malice, combined, are essential.'  'If the evidence supports the former, we need not consider the latter, since it may be inferred.'  Thus, having determined that the defendants lacked probable cause as a matter of law, we conclude that the jury could reasonably have inferred that the defendants acted with malice.") (citations omitted).[6]

---

[6] Plaintiff argues that Defendants' failure to write a formal report of their interview of Poindexter until a year later and well after the commencement of criminal proceedings, violates *Brady v. Maryland*, 373 U.S. 83 (1963) and demonstrate Defendants' malice. Although the lack of probable cause would be sufficient to infer malice, the converse is not

As with a claim of false arrest, the question of whether a particular set of facts supports probable cause, which is the issue here, is a question of law. *Walczyk*, 496 F.3d at 157; *Falls Church Group*, 912 A.2d at 1027, 281 Conn. at 94 ("'[t]he existence of probable cause is an absolute protection against an action for malicious prosecution, and what facts, and whether particular facts, constitute probable cause is always a question of law.'") (alteration in *Falls Church Group*; citation omitted); *Bhatia*, 948 A.2d at 1020, 287 Conn. at 411 (same); *Horton v. Town of Brookfield*, No. 3:98cv01834 (JCH), 2001 WL 263299, \*4, 2001 U.S. Dist. LEXIS 3378, \*12–\*13 (D. Conn Mar. 15, 2001) (applying same to malicious prosecution claim brought under § 1983 and the Fourth Amendment).

Plaintiff argues that, even assuming Defendants had probable cause to arrest him, they no longer had probable cause to keep him incarcerated after they interviewed Poindexter. Plaintiff focuses on Poindexter's description of "Bone," the person accompanying Conley, as "wearing a baseball cap and a blue fleece," and to Poindexter's statement that he did not see Plaintiff at any point on the evening of the murder. However, Poindexter's observation of the baseball cap and blue fleece is not at total odds with Mallory's description of the suspect as "wearing a . . . baseball cap, dark colored baseball jacket and dark colored jeans" (Inconiglios 5/22/04 Report at 3), or even the less-than-reliable Torrence's a fleeing Hispanic male wearing a baseball cap (*id.* at 6). Moreover, Poindexter's statement that he did not see Mr. Moreno does not vitiate the preexisting probable cause to suspect Mr. Moreno of the shooting. Poindexter had nothing to say about anyone entering Mallory's apartment with Conley or exiting without him, as he only

---

true. *Falls Church Group*, 912 A.2d at 1027, 281 Conn. at 94 ("The want of probable cause, however, cannot be inferred from the fact that malice was proven.").

described the person who went "around the building" with Conley at some point before the shooting.  Thus, Poindexter's statements do not contradict the photo identifications by the eyewitnesses and the motive witness, and thus do not erase the probable cause which existed to arrest and prosecute Plaintiff.

Having concluded that Defendants had probable cause to prosecute Mr. Moreno, the Court grants summary judgment to Defendants on Plaintiff's malicious prosecution claim, and therefore will not consider Defendants' claim of qualified immunity.  *See Giannamore v. Shevchuk*, 947 A.2d 1012, 1017, 108 Conn. App. 303, 311 (2008) ("It is well established in our jurisprudence that '[t]he existence of probable cause is an absolute protection against an action for malicious prosecution[.]'") (quoting *Vandersluis v. Weil*, 407 A.2d 982, 985, 176 Conn. 353, 356 (1978)) (first alteration in *Giannamore*).

C.     *Intentional Infliction of Emotional Distress*

In Connecticut the tort of intentional infliction of emotional distress is comprised of four elements:

> "It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."

*Appleton v. Board of Educ. of Town of Stonington*, 757 A.2d 1059, 1062, 254 Conn. 205, 210 (Conn.) (quoting *Petyan v. Ellis*, 510 A.2d 1337, 1342, 200 Conn. 243, 253 (1986)) (alterations in *Petyan*).  Whether an actor's conduct is "extreme and outrageous" is an issue for the Court in the first instance and a factual question for the jury "[o]nly where reasonable minds disagree" as to whether "the conduct has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Appleton*, 757 A.2d at 1062, 254 Conn. at 210–11.

Plaintiff argues that "it is a question for the finder of fact as to whether the actions of the [D]efendants [were] reasonable and/or fell outside the scope of what they were permitted to do as police officers." (Pl.'s Mem. Opp'n at 5.)  However, Plaintiff provides no evidence critical of the manner in which Defendants arrested him.  The entirety of the evidence he has presented consists of his affidavit and copies of certain police witness interview reports.  He avers only: "I was arrested, although I do not fit the description of the person seen with Conley immediately before he was shot."  (Moreno Aff. at ¶ 13.)  This evidence, however, is insufficient for any jury to conclude that Defendants' conduct was extreme or outrageous.

Since the summary judgment record shows as a matter of law that Defendants' actions were lawfully taken with probable cause, and Plaintiff proffers no evidence as to the manner in which Defendants effectuated the otherwise lawful arrest or prosecution, there is no evidence on which a jury could conclude that Defendants' conduct was "beyond all bounds of decency" or is "to be regarded as . . . utterly intolerable in a civilized community." *See Winter v. Northrop*, No. 3:06cv216 (PCD), 2008 WL 410428, *7, 2008 U.S. Dist. LEXIS 10203, *21 (D. Conn. Feb. 12, 2008) (where plaintiff brought false arrest and IIED claims, officer's "routine participation in [the p]laintiff's arrests, based upon probable cause, . . . does not constitute intentional infliction of emotional distress"); *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 454 (D. Conn. 2002) ("Because the Court finds that Gasparri had probable cause to arrest Garcia and that his constitutional right was therefore not violated, Gasparri's

conduct cannot be found to be 'extreme and outrageous' as a matter of law."). Therefore, summary judgment must be granted in Defendants' favor as to Plaintiff's claim of intentional infliction of emotional distress.

**IV.    Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. # 26] is GRANTED. The Clerk is directed to close this case.


IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 9th day of March, 2009.